UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SPIRE BIOMEDICAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> TACTX MEDICAL, INC. and CATHETER AND DISPOSABLE TECHNOLOGY, INC., <br><br> Defendants. | C.A. No. 11-cv-10067 <br><br> **COMPLAINT AND JURY DEMAND** |

## PARTIES

1. Plaintiff Spire Biomedical, Inc. ("Spire") is a Massachusetts corporation having a principal place of business at One Patriots Park, Bedford, Massachusetts.

2. Tactx Medical, Inc. ("Tactx") is a California Corporation having a principal place of business at 1353 Dell Avenue, Campbell, California.

3. Catheter and Disposable Technology, Inc. ("CDT") is a Minnesota Corporation having a principal place of business at 13845 Industrial Park Blvd., Plymouth, Minnesota. On information and belief, Tactx acquired CDT in or about 2008.

## JURISDICION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceed $75,000, exclusive of interest and cost, and there is complete diversity of citizenship between on the one hand, Plaintiff and, on the other hand, Tactx and CDT (collectively, "Defendants").

5. This Court has personal jurisdiction over Defendants pursuant to Massachusetts long-arm statute, M.G.L. c. 223A, § 3 as Defendants have, among other things, transacted

business in this commonwealth and contracted to supply services and things in this commonwealth.

6. Venue is proper pursuant to 28 U.S.C. § 1391(a).

## FACTS COMMON TO ALL COUNTS

*Spire's Hemodialysis Catheters*

7. Hemodialysis is a process by which blood is extracted from a patient and cleaned extracorporeally and has been the principal treatment for kidney failure and other renal diseases for at least fifty years.

8. From approximately 2002 through 2009, Spire marketed and sold a comprehensive family of chronic hemodialysis catheters. In particular, Spire marketed and sold two lines of catheters—the Decathlon and Alta—designed for percutaneous (through the skin) insertion.

9. The Decathlon and Alta catheters are dual-lumen catheters made from polyurethane. One lumen is used to extract blood from the patient and the other lumen returns cleaned blood from the hemodialysis machine. The catheters include a bifurcation hub at the juncture where the dual-lumen catheter body meets two extension tubes, which are used to connect the catheter to a hemodialysis machine.

10. In or about 2003, Spire engaged CDT to assemble its Decathlon catheters according to Spire's design and performance specifications. Subsequently, Spire also engaged CDT to assemble its Alta catheters according to Spire's design and performance specifications.

11. CDT's responsibilities included connecting extension tubes to dual-lumen catheter bodies provided by Spire. This assembly involved, among other things, the molding of a

12. CDT subcontracted with a third-party to mold the bifurcation hub and thereby assemble the Decathlon and Alta catheter components together. After the bifurcation hub was molded, the third-party returned the assembled catheter to CDT for further processing.

13. The original Decathlon and Alta design specifications were communicated by Spire to CDT via product assembly specifications, text summaries, and engineering drawings. These specifications included a minimum depth for insertion of the catheter body into the bifurcation hub of .300 inches.

14. In addition, Spire provided CDT with performance specifications for the Decathlon and Alta catheters. These performance specifications included, among other things, minimum requirements for tensile strength at the bifurcation-hub-to-catheter juncture in accordance with International Organization for Standardization ("ISO") standards.

15. Any and all changes to the design and performance specifications were communicated by Spire to CDT.

16. Spire expressly stated to CDT that it would not accept catheters not made to Spire' specifications.

17. CDT understood that it was, at all times, required to comply with Spire's design and performance specifications.

18. For example, after CDT was selected as the assembler, CDT validated its equipment, tooling, and manufacturing process to ensure that all Spire's design and performance specifications could be met by CDT.

19. In 2003, CDT affirmatively represented to Spire that all equipment, tooling, and manufacturing processes had been validated and that CDT was ready and able to produce the assembled product according to all Spire's specifications.

20. Similar validations were performed by CDT over the course of the parties' relationship and each time CDT affirmatively represented to Spire that all design and performance specifications were being met.

*2006 Catheter Failures*

21. In 2006, Spire received two field complaints. In these cases, the dual-lumen catheter body of Decathlon catheters assembled by CDT partially or completely separated from the bifurcation hub.

22. Following these complaints, Spire undertook an investigation to determine the cause of the incidents.

23. Spire informed CDT of the failures and returned one of the defective catheters to CDT. Spire and CDT concluded that the catheter tubing was not fully inserted into the bifurcation hub. CDT, however, communicated to Spire that it believed that the defects were an isolated incident.

24. On or about April 13, 2006, Spire issued a directive entitled "Corrective Action 021" to CDT.

25. CDT responded by further testing product, qualifying a new molder for the bifurcation hub and, upon information and belief, emphasizing the importance of insertion depth of the catheter into the bifurcation hub with the new molder.

26. In or about October 2006, Spire visited CDT at its facility to discuss compliance with Corrective Action 021. During that visit, Spire was led to believe that CDT had fully

complied with "Corrective Action 021" and that all Spire's specification requirements were being met.

27. In 2006, CDT never communicated to Spire during the corrective action process that CDT could not meet Spire's design and performance specifications.

28. In or about 2008, CDT did notify Spire that it was having difficulty meeting the minimum insertion depth for the placement of the catheter body into the bifurcation hub. As a result, Spire altered the design specifications to decrease the minimum insertion depth from .30 to .24 inches.

29. No further field complaints or notifications from CDT regarding inability to meet design and performance specifications were received until the Fall of 2009.

*2009 Failures & FDA Recalls*

30. In or about August and September 2009, Spire received three more field complaints in which the dual-lumen catheter body separated from the bifurcation hub of Decathlon catheters assembled by CDT.

31. Spire initiated another investigation into the incidents.

32. This time Spire concluded that these field complaints needed to be reported to the FDA and that a product recall was required.

33. On October 23, 2009, Spire initiated a full recall of all Decathlon and Alta catheters, which included the recall of over 55,000 catheters and catheter kits.

34. The product defect identified in the field complaints was again traced to problems in the manufacturing of the bifurcation hub.

35. CDT again had failed to meet Spire's design specifications. Non compliance with insertion depth requirements during manufacture of the bifurcation hub, combined with non-

optimal bonding of the tubing, had caused the detachments of the catheter bodies from the bifurcation hubs in the field complaints. In addition, catheters with extremely low insertion depth were found to fail the tensile strength requirement contained in Spire's performance specifications.

36. In the course of its investigation into the field complaints, Spire learned that CDT and its sub-contractor not only failed to meet the design and performance specifications, but that CDT and its sub-contractor intentionally deviated from Spire's specifications.

37. CDT, without notification to or permission from Spire, had altered the requirement for minimum insertion depth from .24 to .125 inches. In addition, although CDT had continued to represent to Spire that its equipment, tooling, and manufacturing processes were validated to meet Spire's specifications, as early as 2004 CDT in fact was only validating the catheter body insertion depth to .100 inches.

38. Accordingly, catheters assembled by CDT failed to meet the minimum depth for insertion of the catheter body into the bifurcation hub. Some of catheters also failed to meet the minimum requirements for bifurcation-hub-to-catheter-body tensile strength.

39. Spire would not have accepted product from CDT had it known that the catheters failed to comply with Spire's design and performance specifications.

40. CDT's failure to comply with Spire's design and performance specifications resulted in defective product and the required recall in October 2009.

41. Spire paid for the entire expense of the recall. In addition, almost the entirety of the product recalled was ultimately destroyed pursuant to FDA requirements.

*Acquisition By Bard Access Systems, Inc.*

42. The recall of Decathlon and Alta catheters was initiated shortly after Spire signed an Asset Purchase Agreement with Bard Access Systems, Inc. ("Bard"). Pursuant to that agreement, Bard was to purchase substantially all of Spire's assets relating to or arising from its hemodialysis catheter business, including all hemodialysis products and inventory.

43. As a result of the recall, Spire was unable to meet the required conditions to close the transaction. Instead, Spire was forced to renegotiate with Bard the terms of the acquisition.

44. In December 2009, Spire and Bard restructured the asset purchase transaction as a result of the pending recall of Decathlon and Alta catheters. That restructuring involved, among other things, a substantial reduction to the purchase price of Spire's hemodialysis catheter business as well as other material changes to the terms of the original asset purchase agreement.

45. Absent the recall, Spire and Bard would have completed the original asset purchase agreement in 2009.

**COUNT I**
**(Breach of Contract)**

46. Spire realleges and incorporates herein the averments of paragraphs 1–45.

47. Spire and Defendants had a valid and enforceable agreement concerning the assembly of hemodialysis catheters.

48. Spire fully performed its obligations under the contract.

49. That agreement required CDT to assemble Decathlon and Alta catheters in accordance with Spire's design and performance specifications.

50. Defendants did not assemble the catheters in accordance with Spire's design and performance specifications.

51. Defendants materially breached the parties' agreement by failing to assemble the catheters pursuant to the design and performance specifications provided by Spire.

52. As a direct and proximate result of Defendants' breaches of the agreement, Spire has sustained damage.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

53. Spire realleges and incorporates herein the averments of paragraphs 1–52.

54. Defendants, through their failure to meet Spire's design and performance specifications and failure to disclose material information concerning changes to those specifications, breached the implied covenant of good faith and fair dealing.

55. As a direct and proximate result of Defendants' breaches, Spire has sustained damage.

## COUNT III
### (Violation of M.G.L. c. 93A)

56. Spire realleges and incorporates herein the averments of paragraphs 1–55.

57. Spire and Defendants are engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A.

58. The conduct of Defendants described above constitutes unfair or deceptive acts or practices in violation of M.G.L. c. 93A.

59. The unfair or deceptive acts or practices by Defendants were knowing and willful.

60. Defendants' acts and practices complained of herein occurred primarily and substantially in Massachusetts or resulted in injury or harm primarily and substantially in Massachusetts.

61. As a result of Defendants' conduct, Spire has sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Spire prays that this Court:

A.  Enter judgment for Spire on Counts I through III;

B.  Award Spire the amount of its damages—doubled or trebled—plus interest, costs, and attorneys' fees; and

C.  Grant such other and further relief as is just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all claims so triable.


SPIRE BIOMEDICAL, INC.,

By its attorneys,

/s/ Heather B. Repicky
Thomas J. Engellenner (BBO# 154460)
Stephen J. Brake (BBO# 546972)
Heather B. Repicky (BBO# 663347)
NUTTER MCCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
(617) 439-2000

Dated: January 11, 2011

9